**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

CALVIN RODRIGUE                          CIVIL ACTION NO. 09-985

VERSUS                                   JUDGE ELIZABETH ERNY FOOTE

MOREHOUSE DETENTION CENTER, ET AL        MAGISTRATE JUDGE KAREN L. HAYES

## **MEMORANDUM RULING**

In this matter, the Plaintiff, Mr. Calvin Rodrigue, a prisoner, alleges that his

Eighth Amendment right to be free from cruel and unusual punishment was abridged

when his emergency medical complaints were ignored by the prison staff, causing his

appendix to perforate.  When Rodrigue was taken from the Morehouse Detention

Center to the emergency room, almost two weeks after he began complaining of

extreme stomach pain, a gangrenous fifteen centimeter section of his bowel was

removed.  He remained in a hospital for almost two months as physicians gained control

over numerous life-threatening complications, including the failure of three of his organ

systems, two post-operative abscesses, and prolonged sepsis.  Rodrigue alleges that

Licensed Nurse Practitioner ("LPN") Dana Grayson, Lieutenant Brad Fife, Sergeant Keith

Clacks, Assistant Warden Issaic Brown, Warden Robert Tapp, and Sheriff Mike Tubbs

are responsible for the violation of his Eighth Amendment rights.  Rodrigue also alleges

that the policies and customs of the Morehouse Parish Sheriff's Office pertaining to

medical treatment within its prisons were the moving force behind the constitutional

violation, thus making Morehouse Parish liable.  A bench trial was held on the 7th and 8th of February 2012.  At the close of evidence, the Court ordered additional briefing.  The final exhibit related to the post-trial briefing was submitted on June 4, 2012.  For the reasons given below, the Court finds that LPN Dana Grayson and Lieutenant Brad Fife violated Rodrigue's Eighth Amendment right to be free from cruel and unusual punishment.

## I.    Liability of Defendants in their Individual Capacities

### A.    The Applicable Law

Fed. R. Civ. P. 52(a) provides, in relevant part, that in bench trials, the court "must find the facts specially and state separately its conclusions of law separately..." and that "[j]udgment must be entered pursuant to Rule 58."  The Eight Amendment of the United States Constitution grants all persons the right to be free from cruel and unusual punishments:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

> U.S. Const. amend. VIII.

In Estelle v. Gamble the Supreme Court ruled that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." 429 U.S. 97, 104 (1976).  Deliberate indifference entails a level of culpability higher than negligence but "less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Eighth Amendment prisoner claims are classified as either attacks on conditions of confinement or allegations of episodic acts or omissions.  Anderson v. Dallas Cnty. Tex., 286 Fed.Appx. 850, 857 (5th Cir 2008).  Rodrigue does not attempt to place his claim in either category.  A conditions-of-confinement case attacks the "general conditions, practices, rules or restrictions" of confinement, alleging that they deprived the prisoner of a basic human need.  Id.  In a conditions of confinement case the court assumes that by virtue of creating and maintaining the condition at issue the local governmental entity intended to cause the alleged constitutional deprivation.  Id.  An episodic-act-or-omission claim alleges a particular act or omission of one or more officials as the complained-of harm.  Scott v. Moore, 114 F.3d 51, 53 (5th Cir. 1997).  Typically, in an episodic act or omission case "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission."  Id.[1]  In this case, Rodrigue alleges that LPN Grayson's failure to refer him to an outside

---

[1]While the episodic act or omission/conditions of confinement distinction has often been made in pretrial detainee cases—cases in which the Fourteenth rather than the Eighth Amendment is implicated—the Fifth Circuit has ruled that there is no reason the duty of prison officials to provide medical care should vary depending on whether that duty is created by the Fourteenth Amendment or the Eighth Amendment.  Hare v. City of Corinth, Miss., 74 F.3d 633, 648-49 (5th Cir. 1996) ("despite the distinct constitutional sources of the rights of pretrial detainees and convicted inmates, state jail and prison officials owe the same duty to provide the same quantum of basic human needs and humane conditions of confinement to both groups [prisoners and pretrial detainees].");  see also Corley v. Prator, 290 Fed.Appx. 749, 752 (5th Cir. 2007) (unpublished) (applying the distinction in an Eighth Amendment suit);  Lawson v. Dallas Cnty., 286 F.3d 257, 264 (5th Cir. 2002) (same).

clinician deprived him of his Eighth Amendment right.  Rodrigue also alleges that the prison's medical policy caused Rodrigue's injury.  Rodrigue's allegation that the actions of LPN Grayson and other prison officials are the immediate cause of his constitutional injury leads the Court to conclude that Rodrigue's claim is properly characterized as an episodic act or omission claim.

For an episodic act or omission claim, the test for deliberate indifference includes an objective and a subjective component.  The inmate must first show as an objective matter that "he is incarcerated under conditions posing a substantial risk of serious harm."  <u>Gobert v. Caldwell</u>, 463 F.3d 339, 345-46 (5th Cir. 2006). Next, tracking the Eight Amendment's focus on those who "inflict" punishment, the inmate must show that a prison official both knew of and disregarded "an excessive risk to inmate health or safety."  <u>Farmer</u>, 511 U.S. at 837.  To satisfy this subjective prong, the inmate must show that the official was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the official also drew the inference.  <u>Id.</u>

Of course, not every instance of inadequate medical treatment in prison will violate the Eighth Amendment.  An "inadvertent failure to provide adequate medical care," does not rise to the level of "an unnecessary and wanton infliction of pain" such that it is "repugnant to the conscience of mankind."  <u>Estelle</u>, 429 U.S. at 105. (citations omitted); <u>see also</u> <u>Domino v. Tex. Dep't of Criminal Justice</u>, 239 F.3d 752 (5th Cir. 2001) (finding no deliberate indifference for failure of prison physchiatrist to recognize that an

inmate posed a serious suicide risk to himself).  A prisoner's disagreement with the medical treatment he received, absent exceptional circumstances, does not by itself constitute deliberate indifference.  <u>Gobert v. Caldwell</u>, 463 F.3d 339, 346 (5th Cir. 2006). The question is whether prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  <u>Id.</u>  A "serious medical need" is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required.  <u>Id.</u> at 345, n.12 (citation omitted).

Each defendant has asserted the defense of qualified immunity.  A public official is entitled to qualified immunity unless the plaintiff demonstrates:  (1) that the defendant violated the plaintiff's constitutional rights; and (2) that the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation.  <u>Porter v. Epps</u>, 659 F.3d 440, 445 (5th Cir. 2011).   If the issue of qualified immunity is not decided before trial, the defense of qualified immunity may be submitted to the fact finder, who must then determine the objective legal reasonableness of the public official's conduct by construing the facts in dispute.  <u>Id.</u>

**B.    Findings of Fact**

The parties have agreed to the following stipulation of the basic facts concerning the progress of Rodrigue's illness and treatment:

9.    On May 31, 2008, Plaintiff submitted a request for emergency treatment wherein he declared himself in emergency because of "stomach ache, chill

bumps, hot/cold, complaint of vomiting, diabetic related." Plaintiff saw Nurse Grayson, that day, who noted "Phenergan supp. 25mg per inmate" and "instructed sgt. inmate could have another supp. @ 2AM – increase fluids."

10.    On June 1, 2008, Plaintiff submitted a sick call request wherein he listed his illness or complaint as "same problem as emergency sick call, no bowl movement in past 36 hours & the green stuff I threw up was partially bowl… I've had this before on the street." Plaintiff was seen by Nurse Grayson, the following day, who noted "instructed to increase fluids and lie down and eat to ensure normal BM. No vomiting today. Medezine 25mg for nausea. If not resolved on 6/4 to return to office. Biscadyl 3po now for no BM."

11.    On June 3, 2008, plaintiff submitted a sick call request wherein he listed his illness or complaint as "I haven't gotten any better, so please Ms. Grayson give me something so I can make a bowl movement the pain hurts so bad." Plaintiff was seen by Nurse Grayson on June 4, 2008, who noted "instructed to increase fluids, and voiced understanding" and prescribed "MOM [milk of magnesia] 30cc with 8 oz of H20."

12.    On June 5, 2008, Plaintiff submitted a sick call request wherein he listed his illness or complaint as "still having complications concerning my stomach problem, I need assistance immediately." Plaintiff was seen by Nurse Grayson on June 6, 2008, who noted "fleets enema given to inmate. Reports results within 30 min. States, "had a good BM." Instructed to replace fluids and eat vegetables."

13.    On June 5, 2008, Plaintiff submitted an inmate request form to Lt. Fife wherein he states, "On May 31, 2008, I made an emergency sick call about my intestants being constipated and all I received was two suppository tablets. I've began to vomit for at least two days. On the 2nd of June, I seen the nurse and gave me two pills to help keep my food down. At this time I haven't deficated. On the 4th of June, she gave me a half of cup of stool softener and it only lasted a couple of hours. On the 5th of June, I still haven't [sic] deficated and now my stomach is hard as a rock. I've explained to her the proper treatment that I needed an enema to cleanse my intestants. But I was told that I'm not fonder on giving you an enema. Because she would rather have me pass it on my own. I've experienced this before and know what it would take to resolve my condition. I request some assistance in regards to getting me the medical assistance that is or may be required."

14.     Plaintiff had no written medical requests or complaints from June 6, 2008 to June 10 with Morehouse officials.

15.     On June 10, 2008, Plaintiff submitted a request for emergency treatment wherein he declared himself in emergency because of "haven't made a bowel movement, vomiting, stomach pains, nausea, can't hold food in stomach or liquids." Plaintiff was seen by Nurse Grayson and she noted "Sent to Conway ER" and "Will check ER records on return for diagnosis." It was determined at E.A. Conway Medical Center in Monroe, Louisiana, that Plaintiff's appendix had ruptured, and an ileocectomy was performed.

16.     On June 14, 2008, Plaintiff was transported from E. A. Conway Medical Center to LSU Medical Center in Shreveport, Louisiana, where he was placed in intensive care for an extended period before being placed on a floor.

17.     Plaintiff was hospitalized at LSU Medical Center in Shreveport until August 6, 2008, when he was discharged and transported to Forcht-Wade Correction Center's medical prison.

[Record Document 72, pp. 3-4].[2]

At the time of his transfer from the Morehouse Detention Center to EA Conway Hospital, Rodrigue was in a septic condition.[3]  Post-operative diagnosis confirmed that his appendix had perforated.   He had diffuse peritonitis, fifteen centimeters of his bowel were gangrenous, and he had approximately "two to three liters of purulent, foul-smelling pus and succus in the abdomen."  [TT at 285].  After the operation, Rodrigue developed renal and respiratory failure and was transferred to the LSU Medical Center in Shreveport.  [TT at 286-88].  He also developed two post-operative abscesses while at the LSU Medical

---

[2] "TT" will be used to refer to the trial transcript, which can be found at Record Documents 95 and 96. Page numbers for citations in the trial transcript refer to the page numbers of the transcript and not the page numbers in the docket.

[3] Sepsis is a term that signifies an overwhelming infection, possibly in the bloodstream.  [TT at 285].

Center.  [TT at 302].  Dr. Larry Sasaki, Plaintiff's expert, testified that given the failure of three of Rodrigue's organ systems, his mortality rate during this period was "extremely high."  [TT at 300].  Due to these numerous post-operative complications, Rodrigue was not discharged from the hospital until August 6, 2008—almost two months after he arrived at the emergency room.  [TT at 86].

Rodrigue testified that he was in excruciating pain from May 31, 2008 onward.  [TT at 33, 49, 73].  He testified that the pain was so bad that he was balled up in a fetus position and that it hurt severely when he walked.  Id.  He ranked his pain at a level of nine or ten on a range of zero to ten, and stated that he "wouldn't wish that type of pain on my worst enemy."  [TT at 49].  This testimony is corroborated by his June 3, 2008 sick call request, in which he states: "I haven't gotten any better, so please Ms. Grayson give me something so I can make a bowl [sic] movement the pain hurts so bad."  [Record Document 72, p.3].  His June 5, 2008 sick call request, wherein he stated "still having complications concerning my stomach problem, I need assistance immediately" also corroborates his testimony.  Id.  Similarly, Dr. Sasaki testified that given Rodrigue's condition between May 31, 2008 and June 10, 2008 any lay person would have recognized that Rodrigue was in pain.  [TT at 366].  Dr. Sasaki also testified that having difficulty walking is a symptom that is consistent with peritonitis.  [TT at 286].

On the contrary, LPN Grayson consistently testified that Rodrigue did not appear to be sick.  [TT at 115, 121-22].  She claimed that she only remembered him complaining of pain to her once, on June 10, 2008, the day he was sent to the hospital.  [TT at 128].  The

Court finds LPN Grayson's testimony not credible.  There is at least one documented instance of Rodrigue complaining of extreme pain before June 10, 2008.  On June 3, 2008 he wrote a sick call request where he stated, "I haven't gotten any better, so please Ms. Grayson give me something so I can make a bowl [sic] movement the pain hurts so bad." [Record Document 72, p.3].  Furthermore, the Court is persuaded by the testimony of Dr. Sasaki, a specialist in colon-rectal surgery, that based on the post-operative findings made by Dr. Neal Holm, the surgeon who initially operated on Rodrigue, Rodrigue's acute appendicitis began sometime around May 31, 2008 and that his appendix perforated around June 6, 2008.  [TT at 308, 364].  The Court finds it inconceivable that an inmate with acute appendecitis which progressed to a perforated appendix and became gangrenous would not complain of pain when seen by a Nurse.  The Court also finds it inconceivable that such an inmate would not appear to be sick.  Accordingly, the Court finds from Rodrigue's testimony, the plain wording of his emergency requests and sick calls, and from Dr. Sasaki's medical opinion of the seriousness, symptoms, and progression of Rodrigue's illness that Rodrigue complained of pain to LPN Grayson and that he was obviously in serious pain from May 31, 2008 to June 10, 2008.[4]

_____

[4]Dr. Sasaki testified that the length of Rodrigue's symptoms were prolonged by the retrocecal nature of his appendix, which made it possible for his abdomen to wall off the infection. [TT at 247].  In a typical presentation, the symptoms of acute appendicitis pprogress in twenty-four or forty-eight hours, but in a case where the patient has a retrocecal appendix the symptoms may be prolonged.  Regardless of the length of the symptoms, Dr. Sasaki testified that Rodrigue would have been in obvious pain during the entire duration of his illness. [TT at 366].

The Court also finds that LPN Grayson did not perform a physical examination of Mr. Rodrigue's abdomen before June 10, 2008.  LPN Grayson admitted on the stand that she never felt his stomach before June 10, 2008.  [TT at 130].[5]  LPN Grayson claimed that palpating the abdomen to determine "what's wrong" was beyond the scope of her practice.  [TT at 131].  Dr. Sasaki stated that although a LPN would not be qualified to diagnose an abdominal condition  [TT at 318],  a LPN should be able to perform a physical examination in order to detect whether a condition needs to be evaluated further.  The Court finds that given Dr. Sasaki's testimony and Nurse Grayson's claim that she did in fact perform a physical exam of Rodrigue's abdomen on June 10, 2008, that she was capable of performing a physical examination of the abdomen in order to determine whether more expert examination was needed.

The Court also finds that Rodrigue complained to LPN Grayson of vomiting, abdominal pain, his stomach being "hard as a rock," constipation, and anorexia consistently from May 31, 2008 through June 5, 2008 and then again on June 10, 2008.  Defense Counsel repeatedly pointed out that Rodrigue did not specify each of these symptoms on

---

[5]Rodrigue testified that LPN Grayson never physically examined his abdomen.  [TT at 31, 42].  The Court is not certain whether LPN Grayson did in fact physically examine Rodrigue's abdomen on June 10, 2008.  On the one hand, Rodrigue testified that she did not examine him that day.  Dr. Sasaki, however, noted that at that time Rodrigue was in a septic condition, which would have impaired his mental functioning.  On the other hand, LPN Grayson's notation that Rodrigue's abdomen was "slightly firm to soft" is inconsistent with the immediately subsequent examination at EA Conway and with Rodrigue's persistent earlier complaints that his stomach was "hard as a rock."  The Court does not, however, have to resolve this factual dispute in order to render a decision.

each of his individual complaints.[6]  [TT 70-78, 148-151, 322-333].  Assuming for the sake of argument that the only complaints Rodrigue made were those he made in writing, an assumption that completely ignores Rodrigue's own testimony and assumes that Nurse Grayson made no inquiries of her patient beyond the written complaint in the request for sick call, it is still clear from the plain language of his written complaints that Rodrigue consistently complained of the same symptoms.  On May 31, 2008, he complained of stomach ache, vomiting, and "chill bumps, hot/cold."  On June 1, he complained of "same problem as emergency sick call" and adds complaints of constipation.  On June 3, he stated "I haven't gotten any better."  On June 5, 2008, he wrote "still having complications concerning my stomach problem."  Finally, on June 10, 2008, he complained of

---

[6]In his testimony, the Defendants' expert, Dr. Demaree Inglese, also attempted to separate the series of complaints into a number of discrete written symptoms that LPN Grayson treated.  [TT at 388-90, 392-397, 445-446].  The Court is not persuaded by Dr. Inglese's testimony.  Dr. Inglese acknowledged that the fact that he worked in a correctional facility might affect his ability to remain objective, though to be sure he also claimed he would not have testified had he thought that his work would interfere with his bias or credibility.  [TT at 421, 442-43].  Dr. Inglese testified that he had been hired to testify by Defense Counsel's firm in suits against sheriffs offices around six or seven times previously.  [TT at 379].  By way of contrast, Dr. Sasaki testified that although he was losing money by testifying, he felt that it was his duty to testify because the case seemed so egregious to him after reviewing it.  [TT at 459-60].  Dr. Inglese was not as familiar with Rodrigue's medical records or with the typical progression of abdominal illnesses as Dr. Sasaki.  Compare Dr. Inglese's testimony regarding the progression of Rodrigue's illness [TT at 438-42] with Dr. Sasaki's testimony regarding the progression of Rodrigue's illness [TT at 282-85, 364-365].  Dr. Inglese's complete discounting of the testimony of Rodrigue—both his complaints at the time of his illness and his testimony at trial—further called his impartiality into doubt.  [TT at 439-441].  Finally, Dr. Inglese consistently colored the evidence of Rodrigue's complaints to Nurse Grayson by dramatizing Rodrigue's imagined interaction with LPN Grayson in a way that assumed Rodrigue's complaints were not serious.  [TT at 389-96].  These components of his testimony convince the Court that his testimony is entitled to much less weight that the testimony of Dr. Sasaki.

constipation, vomiting, stomach pains, nausea, and anorexia.  [Record Document 72, pp. 3-4].  Each complaint incorporates the symptoms of the earlier complaints.  Furthermore, Rodrigue testified that due to the severity of his pain, his priority in writing his complaints was to ensure that he saw the nurse, not to exhaustively list his symptoms.  [TT at 73] ("If you was in pain like I was in pain, all you trying to do is see someone right quick. And everything else you need to say you will just say it verbally.").  Dr. Sasaki confirmed that one would expect a patient in serious pain to simply write whatever was necessary to get an audience with the medical provider.  [TT at 328] ("But you've got to understand if somebody is hurting and in pain, are you going to sit there and specify all your symptoms?").  Given this common-sense principle, the Court finds it more probable than not that Rodrigue's testimony that he complained of these symptoms verbally to LPN Grayson is accurate.  Additionally, it would be expected that during her sick call visit with Rodrigue in response to his written complaints, LPN Grayson would have questioned her patient about the extent, nature, and duration of his symptoms.   Once again, LPN Grayson's testimony to the contrary is not credible.

Rodrigue's testimony was not entirely credible either.  His explanation for how he obtained a plastic bag which he claims to have used to show LPN Grayson his bilious vomit was confused and contradicted other testimony that plastic bags were not given to inmates.  [TT at 81, 172, 191].  His testimony concerning a biohazard bag in which he claims to have placed bloody underwear to show Nurse Grayson was also confused and was inconsistent with other testimony.  [TT at 77, 80, 141-42, 172, 191].  However, the

portions of Rodrigue's testimony where he describes the pain he was experiencing from May 31, 2008 until June 10, 2008 and his appearance at that time—balled-up in a fetal position, vomiting, suffering from extreme pain while walking—are corroborated by the medical testimony of Dr. Sasaki.  Similarly, Rodrigue's description of his verbal complaints to LPN Grayson are also consistent with Dr. Sasaki's reconstruction of the progression of Rodrigue's illness based on the post-operative findings at EA Conway. The Court only relies on these corroborated portions of Rodrigue's testimony.

### C.    Analysis

The objective component of the deliberate indifference standard is not seriously in dispute.  Relying on Dr. Sasaki's testimony that a delay in treatment of acute appendicitis could result in perforation, and that a perforated appendix has a mortality rate of five percent or more [TT at 245], the Court finds that Rodrigue's medical condition posed a substantial risk of serious harm. To meet the subjective component, Rodrigue must show that the Defendants knew of the serious risk of substantial harm. Farmer, 511 U.S. at 837.  As with all standards that require a plaintiff to prove the mental state of the Defendant, this is a difficult standard to meet.  The Court will first address the liability of LPN Grayson and will then consider the liability of the other Defendants.

### 1.    LPN Dana Grayson

The Court finds that LPN Grayson was presented with evidence of a serious abdominal condition. The Court is further convinced that LPN Grayson knew that Rodrigue was at substantial risk of serious harm. The Court bases this conviction on the following:

the fact that LPN Grayson never performed a physical examination on Rodrigue; from her manner while testifying, including the coached and robotic nature of many of her answers; her unresponsiveness to key questions regarding whether she ignored elements of Mr. Rodrigue's complaints; the inconsistent nature of her testimony as to why she did not refer him to a physician; and the intensity and persistency of the complaints themselves. LPN Grayson knew that there was a substantial risk that Rodrigue had a serious abdominal condition and that if his illness was not properly diagnosed and treated he risked suffering serious harm.  LPN Grayson simply decided to take this risk by choosing not to refer Rodrigue to Dr. Smith, the physician who supervised LPN Grayson, or a hospital.

At the outset, it is important to specify that the question is not whether Nurse Grayson is liable for failing to recognize that Rodrigue had acute appendicitis.  As previously discussed, a LPN is not authorized to make a diagnosis.  However, a LPN, and especially a LPN who is the sole gatekeeper for access to a physician, must be able to know when there is a risk of a serious condition that requires additional care.  LPN Grayson knew that Rodrigue's complaints showed that he was at risk of serious harm. She simply decided not to respond to that risk.  This is not a case where an inmate saw a physician and that physician made an unfortunately incorrect medical decision.  See e.g. Domino v. Texas Dep't of Criminal Justice, 239 F.3d 752 (5th Cir. 2001) (finding no deliberate indifference for failure of prison physchiatrist to recognize that an inmate posed a serious suicide risk to himself).  In this case, despite persistent complaints of extreme abdominal pain and bilious vomiting for over a week, a prisoner was simply denied access to a medical

professional competent to diagnose and treat his condition. The Court is convinced that this conduct rose to the level of a wanton disregard for Rodrigue's serious medical needs. Access to emergency medical care falls within the "minimal civilized measure of life's necessities." Wilson v. Seiter, 501 U.S. 294, 298 (1991).   When a gatekeeper to emergency care, like LPN Grayson, knowingly disregards a prisoner's complaints, she acts with deliberate indifference to that prison's medical needs.

LPN Grayson ignored the persistency, duration, and severity of Rodrigue's complaints.  She also failed to perform a physical exam until the day he was sent to the hospital.  While her refrain in her testimony, and in the Defendant's expert's testimony, was that she "treated each symptom," she declined to touch Rodrigue or perform a physical evaluation in order to determine whether he should be referred to the hospital or to Dr. Smith for diagnosis and treatment.  Although it is true that she attempted to treat those symptoms that she thought were within her scope of practice, it is also true that after it  became clear that her treatments had failed she simply ignored those aspects of Rodrigue's complaints that she knew could suggest a condition requiring outside expertise.[7]

_____

[7]Although Dr. Sasaki's expertise did not, of course, extend to opining on LPN Grayson's mental state, he did testify that he believed that she knew Rodrigue faced a substantial likelihood of harm and that she disregarded his complaints:

> Q:    Do you think she knew that there was a substantial likelihood of harm?
> A:    It think she – I think she recognized that – that delay in treatment could potentially – she should know – she should know that delay in a treatment for a serious abdominal condition could result in harm.
> Q:    Why do you believe that?
> A:    Because I feel like any medical professional would know that.
> Q:    Do you believe that she intentionally disregarded his complaints?
>       THE COURT: To the extent you could answer that, Doctor, it calls for a

During her testimony, LPN Grayson did admit to disregarding some of Rodrigue's complaints.  She stated during direct examination that she did not believe Rodrigue's repeated complaints that he had been vomiting repeatedly:

> Q:  But you reported it in the nursing assessment that he had vomited?
> A:  I said he complained of vomiting. I never said I saw it, never.
> Q:  But you believed it. Correct?
> A:  No, ma'am.
> Q:  So you didn't believe it?
> A:  If I cannot see it, how am I supposed to believe something I can't see?

[TT at 123-24].

Later, when questioned by the Court, LPN Grayson denied not believing Rodrigue's complaints of vomiting, but she still appeared to admit to disregarding his complaints of persistent vomiting because she did not actually see him vomit:

> THE COURT:     Nurse Grayson, do you agree that the records show that he did complain to you of vomiting over several days?

---

> subjective evaluation.
> A:  My gut feeling, essentially my subjective feeling, then I think, yes.
> Q:  You think she intentionally wanted him to be in pain?
> A:  I don't think she wanted him in pain, but she perhaps ignored his symptoms or ignored his condition.
> Q:  You do agree with me that she gave him three different types of medication, meclizine [sic], Phenergan and Milk of Magnesia?
> A:  Yeah, but they didn't address some of the other symptoms of abdominal pain. And also not recognizing that really, to rule out a surgical condition or something that's more serious, that she would have to perform a physical examination or at least touch the abdomen, examine the abdomen.
> Q:  Doctor, have you ever testified in a case dealing with deliberate indifference?
> A:  No, sir.

[TT at 361].

Page 16 of  39

| | |
|---|---|
| THE WITNESS: | Yes, ma'am, he did. |
| THE COURT: | And you just didn't believe him, is that it, because he didn't look sick to you? |
| THE WITNESS: | Not − I didn't not necessarily believe him. When he came to me, he did not look sick to me. |
| THE COURT: | But you've already said if somebody complained of vomiting over several days, that you would think that that was serious enough to go to a doctor or the hospital? |
| THE WITNESS: | Like she asked me, if it was my child that vomited − |
| THE COURT: | Right. |
| THE WITNESS: | − day after day after day, if I were to see my child do that? |
| THE COURT: | Yes. |
| THE WITNESS: | Yes, ma'am, I would take my child. |
| THE COURT: | But then you said you didn't see him vomit, so therefore, you didn't want to take him to the doctor. So you just didn't believe what he was telling you every day was correct? |
| THE WITNESS: | He told me he was vomiting, and I treated his symptoms every day. |
| THE COURT: | He told you − |
| THE WITNESS: | It's not that − No. I did not necessarily not believe him. I can't say that he was vomiting or not vomiting. I don't know. |
| THE COURT: | Okay. |
| THE WITNESS: | I never − I never saw − |
| THE COURT: | You never saw him vomit. |
| THE WITNESS: | I never saw anything. And on one of my sheets, I put "complains of vomiting" because I can only put what I see. |

[TT at 139-40].

Immediately after this testimony, she gave a different explanation for why she disregarded his complaints of continuous vomiting, claiming that Rodrigue had changed his diet during this time as well as the timing of his diabetic medication:

| | |
|---|---|
| THE COURT: | Why didn't you − you know, you acknowledged that he reported to you continuing to vomit over several days. And why didn't you − why didn't this raise the alarm bells with you? |
| THE WITNESS: | Because he had switched back and forth. He had gone from his − from two different types of trays. And he switched his medicine from in the morning to at night during that time. |

[TT at 140].

The only evidence in the record concerning Rodrigue switching diets indicates that it occurred around April 21, 2008—more than a month before his first complaints of abdominal pain.  While Nurse Grayson's testimony was inconsistent regarding her reasons for ignoring Rodrigue's complaints of persistent vomiting, she did consistently testify that she disregarded those complaints.[8]

Of course, LPN Grayson on the stand denied knowledge that Rodrigue was seriously ill. However, the Court does not find her to be a credible witness. Her answers to questions were frequently inconsistent and sounded rehearsed. When pressed, she reverted to the same identical response that she "treated the symptoms"—never giving a straight answer to the question whether she ignored his complaints of abdominal pain.  Even at trial and with the benefit of hindsight she did not appear to show any remorse for her failures or any sympathy with Rodrigue for the extensive pain and suffering he underwent:

> Q:      ... Had you done a physical exam and had you felt his stomach the way it was, do you think maybe you would have done things a little differently?

---

[8]Compare LPN Grayson's response to his complaints of bilious vomiting with Dr. Sasaki's assessment of the complaint: "Anytime we see someone with bilious – we term it bilious vomiting, whether it be yellowish, golden, green – that raises a red flag for me as a clinician, hey, this person may have a serious abdominal condition whether that be due to a bowel obstruction or an infectious process inside the abdomen."  [TT at 267]. Putting aside the question of whether LPN Grayson should have made any diagnosis, the contrast between Dr. Sasaki's response to Rodrigue's complaint and LPN Grayson's response puts the unconcerned nature of LPN Grayson's actions into sharp relief. None of the explanations for ignoring his complaint of vomiting proffered by LPN Grayson were grounded in medical reasoning. Rather, they bespeak a general distrust of Rodrigue and indifference to his condition.

> A:   Knowing what we do now, it's easy to look back, I mean, and say what we could have done. But at the time, I was treating the symptoms that he was coming in with.
> Q:   But you didn't treat the abdominal pain. You've already acknowledged that you didn't even know that there wasn't a protocol for it.
> A:   The symptoms that he came in with, I was treating the symptoms that he came in with. When he came in, I treated him every time.

[TT at 119, 131-32, 138].

As previously explained, the Court finds much of her testimony—such as her claim that Rodrigue never looked sick—incredible given the medical evidence corroborating Rodrigue's own testimony.  Furthermore, LPN Grayson's admission that she would take her child to the hospital if her child was continuously vomiting for a number of days belies her claim that Rodrigue's complaints did not cause her to infer that he potentially had a serious condition:

> Q:   All right. If your family member or friend complained of escalating symptoms over a period of three days in spite of appropriate over-the-counter medications and appropriate comfort measures, would you suggest to them that they see a physician?
> A:   If my child comes to me and she vomits one time, I'm not going to take her vital signs, and I'm not going to take her to the hospital.
> Q:   Okay. What about the second time and the third and the fourth and the fifth?
> A:   If my child vomits five, six, eight days –
> Q:   Days in a row. The first day, second day, third day –
> A:   If I see my child do that over and over again, I'll take her.

[TT at 123].

It is clear from this testimony that LPN Grayson knew that continuous vomiting could be a symptom of a serious condition that would require clinical evaluation, but that she simply did not act on her knowledge when it was Rodrigue who complained of continuous vomiting.

This case is distinguishable from Domino v. Texas Dep't of Criminal Justice, 239 F.3d 752 (5th Cir. 2001).  In Domino, the Fifth Circuit held that a prison doctor who did not intervene before a prisoner who had threatened to commit suicide killed himself did not act with deliberate indifference. The prisoner was treated by the facility for mental illness after he made suicidal threats.  Id. at 753-54.  After he failed to participate in the treatment program the prison ceased treating and medicating him.  Id. at 754.  Immediately before he killed himself, the prisoner met with a psychiatrist, requested medication, and threatened suicide.  Id. at 753. When he was not provided medication he started banging his head on the table and threatening to kill himself.  Id.  The doctor did not give him medication and the prisoner was taken to his cell, where he hung himself.  Id.  Noting that "suicide is inherently difficult to predict, particularly in the depressing prison setting," the Fifth Circuit held that the medical decision of the physician not to treat the prisoner did not rise to the level of deliberate indifference.  Id. at 756.

Domino falls squarely within the ambit of an unfortunately incorrect medical decision.  The prisoner there had been treated for all of his complaints until he chose to discontinue the treatment.  When he made his final complaint, he was referred by a prison psychologist to a prison psychiatrist for further evaluation.  In the instant case, the continuous and intense nature of Rodrigue's complaints of vomiting and abdominal pain were simply ignored by LPN Grayson.  Unlike the prisoner in Domino, Rodrigue was not given the opportunity for a qualified physician to attempt to diagnose his condition.  Furthermore, the inherent unpredictability of suicide is not present in the instant case.

Here, there is an inmate who complained for six days straight of the same extreme physical pain rather than a number of suicide threats strung out over a number of months.

LPN Grayson asserts that she is entitled to the defense of qualified immunity.  There is no dispute that the right to be free from cruel and unusual punishment is a clearly established right.  Gobert, 463 F.3d at 345.  The only question then is whether an objectively reasonable person in LPN Grayson's position would have known that they were violating that right.  The Court is convinced that an objectively reasonable LPN would have known that they were violating a prisoner's right to be free from cruel and unusual punishment when they ignored the persistent nature of a prisoner's consistent complaints of bilious vomit, extreme abdominal pain, anorexia, and constipation after attempts to treat each symptom in isolation failed.  Accordingly, LPN Grayson is not entitled to qualified immunity.

### 2.    Lieutenant Brad Fife

The Court holds that Lt. Fife exhibited deliberate indifference to Rodrigue's medical condition when he ignored Rodrigue's inmate request of June 5, 2008. This holding is based on Lt. Fife's duty to review inmate requests; the complaints outlined in the request itself; Dr. Sasaki's testimony that the complaints in that request would have alerted a layperson to a serious medical condition; Lt. Fife's failure to take any action in the face of those complaints; the Court's assessment as to the lack of credibility of Lt. Fife who testified in contravention of two of his own attorney's stipulations; and Lt. Fife's own testimony that not only did he did not recall the complaint but he questioned whether he

had even received it, despite the fact that it was produced by his lawyer in discovery as part of Rodrigue's inmate file and his lawyer stipulated that Rodrigue had submitted the request to Lt. Fife on June 5, 2008.

Lt. Fife, the chief of prison security at the time of this incident, was the only person at the prison to whom a prisoner could complain if he were denied medical care.[9] In other words, Rodrigue's only recourse in the face of LPN Grayson's failure to refer him to a physician was to file an inmate request with Lt. Fife. Yet, as is discussed in more detail below, Lt. Fife testified shamelessly that he had no memory of receiving Rodrigue's inmate request and that he received "100's" of these requests daily, a figure he later modified to twenty-five to thirty.  [TT at 175].  He admitted that he never spoke with anyone about the request and then attempted to deny he had even received it.  His statements belie the fact that the document was contained in the Morehouse Parish Detention Center Records, produced in discovery as part of this inmate's file, and addressed to Lt. Fife.  Furthermore, stipulation number 13 states that Rodrigue submitted the inmate request to Lt. Fife on June 5, 2008. [Record Document 72, p.3].

Defense Counsel stipulated that on June 5, 2008, after having complained to LPN Grayson for five days, Rodrigue submitted an inmate request form to Lt. Fife in which he made the following complaints:

> On May 31, 2008, I made an emergency sick call about my intestants [sic] being constipated and all I received was two suppository tablets. I've began to vomit for at least two days. On the 2nd of June, I seen the nurse and gave me two pills to help keep my food down. At this time I haven't deficated [sic]. On the 4th of June, she

---

[9]See section III.B. infra.

gave me a half a cup of stool softener and it only lasted a couple of hours. On the 5th of June, I still haven't deficated and now my stomach is hard as a rock. I've explained to her the proper treatment that I needed an enema to cleanse my intestants [sic]. But I was told that I'm not fonder [sic] on giving you an enema. Because she would rather have me pass it on my own. I've experienced this before and know what it would take to resolve my condition. I request some assistance in regards to getting me the medical assistance that is or may be required.

[Record Document 72, p. 3].

The Court finds that this inmate request form evinces a potentially serious medical condition that any layperson would know needs further evaluation. First, there is the duration of the symptoms and second, the statement that Rodrigue's stomach is "hard as a rock."  Dr. Sasaki testified that this last statement was an indication—even to a lay person—of a serious medical condition.  Lt. Fife testified that it was his general practice to review the requests and then go through the dormitory and visit with the inmates with regard to the requests.  Lt. Fife also testified that if he received a complaint like Rodrigue's he would have spoken with LPN Grayson about it:

> Q:    So in this case, Mr. Rodrigue submitted a complaint to you indicating that medical wasn't helping him, that he had seen the LPN on several occasions and that he wasn't getting any relief and he's asking you, please, Lieutenant Fife, please, get me some help. And we have the record. So we know that it exists.
> So what I'm asking you now is what did you do to ensure that Mr. Rodrigue got health care?
>
> ...
>
> A:    I would have took the request to medical and talked to medical about it and wonder, you know – and ask why he wasn't getting the – but I don't remember talking to medical about that subject.

[TT at 178]

No evidence was presented, however, tending to show that Lt. Fife spoke to LPN Grayson about Rodrigue or that he took any action in response to Rodrigue's letter.  Because Lt. Fife disregarded the substantial risk of serious harm Rodrigue's medical condition posed when he took no action whatsoever in response to Rodrigue's complaint, he violated Rodrigue's Eighth Amendment rights.

Lt. Fife's own testimony about the procedure he employed in reviewing the inmate requests demonstrates a cavalier attitude towards those requests.  In response to the question whether he ever received Plaintiff's inmate request, Lt. Fife testified:

Q:    Do you recall whether or not you received an inmate request for Mr. Rodrigue?
A:    I receive hundreds of inmate requests all – daily. I've seen the one that he wrote. But whether – you know, I can't recall the particular day if I got it or not, you know.
Q:    So you don't know whether you ever received that?
A:    Correct.
Q:    Would you normally receive a [sic] inmate request that was addressed to you?
A:    Yes, ma'am. I'm saying I may have received it. But I receive hundreds of those things asking for, you know, everything.
Q:    How many do you receive a day generally?
A:    Probably 25, 30, sometimes more. It's just according.

[TT at 175]

He continued:

Q:    So you may not have ever talked to medical concerning this [Mr. Rodrigue's medical condition]?
A:    Correct.
Q:    So you may not have ever responded at all to this inmate request?
A:    Correct. I think he said he never remembered receiving it. [sic.]
Q:    Is that correct, sir?
A:    I may never have received it.

...

| THE COURT: | Which is it sir? Can you say you never got this or you don't remember getting it? |
| THE WITNESS: | I don't remember getting it. |
| THE COURT: | You don't remember getting it? |
| THE WITNESS: | Correct. |
| THE COURT: | Because you said you get, like, 25 a day? |
| THE WITNESS: | Or more. I mean, there's hundreds a week. I mean, those things, they pour in. |

[TT at 178-80]

Further, Lt. Fife insisted on the stand that he did not recognize Rodrigue and he did not remember anything about Rodrigue, not even that there had been an life-threatening emergency involving this inmate. He continued this insistence in the face of Defense Counsel's stipulation that Lt. Fife had on one occasion escorted Rodrigue to see LPN Grayson.  Lt. Fife testified that he might have escorted an inmate to medical back when he was a "dorm office," but in 2008 his duties did not include such a task.  [TT at 175, 177, and 181]. While this testimony is not crucial to the Court's findings, it illustrates the credibility problems with this witness' testimony.

The Court finds that an objectively reasonable prison official designated to receive inmate complaints would have known that they were violating a prisoner's right to be free from cruel and unusual punishment when they ignored a complaint which stated that the inmate was extremely sick despite the Nurse's attempt to treat the symptoms and which requested help in obtaining additional medical care.  Therefore, Lt. Fife is not entitled to qualified immunity.

**3.    Other Defendants**

Rodrigue has not met his burden of proving that either Sgt. Clacks, Sheriff Mike Tubbs, Warden Robert Tapp, or Assistant Warden Issaic Brown acted with deliberate indifference.  Despite stipulations to the contrary by Defense Counsel, Sgt. Clacks testified that he did not remember escorting the Plaintiff to LPN Grayson.  Although the discrepancy between Defense Counsel's stipulation and Sgt. Clacks' testimony troubles the Court, there was insufficient evidence put on at trial from which the Court could conclude that Sgt. Clacks disregarded a substantial risk of serious harm faced by Rodrigue.  Similarly, there was no evidence put on at trial that suggested that either Sheriff Mike Tubbs, Warden Robert Tapp, or Assistant Warden Issaic Brown had any affirmative involvement in Rodrigue's medical complaints.

## III.   Liability of Morehouse Parish

### A.   Applicable Law

42 U.S.C. § 1983 creates a cause of action in favor of any person who has been deprived of "any rights, privileges, or immunities secured by the Constitution" by anyone acting under color of any "statute, ordinance, regulation, custom, or usage of any State."  A local governmental entity, however, is not vicariously liable under § 1983 for the constitutional torts of its employees.  Rather, a local governmental entity is liable for the actions of its employees only if those actions implement or execute a policy or custom of the local governmental entity.  Monell v. Dep't of Soc. Services of City of New York, 436 U.S. 658, 690-91 (1978).  The  policy must cause official employees to violate another person's constitutional rights.  Jones v. Lowndes Cnty., Miss., 679 F.3d 344, 350 (5th Cir.

2012) (citing City of St. Louis v. Praprotnik, 485 U.S.112, 122 (1988)).  The requirement that the policy or custom of a local governmental entity cause the constitutional violation in order for the local governmental entity to be liable follows from the causation requirement found in the language of § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983 (emphasis added); See also Praprotnik, 485 U.S. at 122.

In addition, the Fifth Circuit has consistently held that the policy must be "the moving force" behind the constitutional violation. Doe ex. rel. Bagee v. Covington Cnty. Sch. Dist. ex rel. Keys, 675 F.3d 849, 866 (5th Cir. 2012); Brumfield v. Hollins, 551 F.3d 322, 331 (5th Cir. 2008); Lawson v. Dallas Cnty., 286 F.3d 257, 263-64 (5th Cir. 2002); Spiller v. City of Texas City Police Depot, 130 F.3d 162, 167 (5th Cir. 1997).

The policies that give rise to § 1983 liability must "be set by the government's lawmakers, or by those whose edicts or acts may fairly be said to represent official policy." Macmillan v. Monroe City, Ala., 520 U.S. 781, 785 (1997).  That is to say that only an official with final policymaking authority may subject a local governmental entity to § 1983 liability through his actions.  Praprotnik, 485 U.S. at 123.  To identify officials or governmental bodies who possess final policymaking authority, the court must focus on the specific "action alleged to have caused the particular constitutional or statutory violation at issue" and determine whether the party responsible for that action is the final

policymaker in that particular area.  McMillian, 520 U.S. at 785.  The question of who constitutes a final policymaker is a legal question that turns on state law.  Id. at 124 ("Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.") (citing Pembaur v. Cincinnati, 475 U.S. 469, 483 (plurality opinion) (1986)). To prove the existence of a custom, a plaintiff must show a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." Hinojosa v. Butler, 547 F.3d 285, 296 (5th Cir. 2008) (citing Bennett v. City of Slidell, 735 F.2d 861, 862 (5th Cir.1984) (en banc)).

In Louisiana, the Sheriff is entrusted with the administration of a parish jail and thus is the final policymaker regarding providing medical care for prisoners.  Oladipupo v. Austin, 104 F.Supp.2d 643, 653 (W.D.La. 2000) (citing La. Rev. Stat. 15:704 (providing that "[e]ach sheriff shall be keeper of the public jail of his parish")).  Sheriff Mike Tubbs testified that he delegated the creation of policies and procedures governing LPNs to Dr. Smith.  [TT at 196].  Accordingly, the Court finds that Dr. Smith was the final policy maker regarding the policies governing LPN Grayson and that Sheriff Tubbs was the final policy maker with regard to all other policies.

**B.    Findings of Fact**

It was the policy of Morehouse Parish ("the Parish") not to staff the Morehouse

Parish Detention Center ("the prison") with a physician.  Rather, a LPN was available at the

prison to attend to the medical needs of prisoners.  The Parish did employ a physician, Dr.

Smith, to oversee the medical operations of the prison.  The LPNs would treat conditions

that were within their scope of practice, but would refer prisoners to Dr. Smith or to the

hospital if a condition was outside their scope of practice.  [TT at p. 117].  Dr. Smith only

came to the prison once a month, but a LPN could refer a prisoner to see him whenever

necessary.  [TT at  p.120].  Dr. Smith also created a document entitled "Standing Orders"

that instructed LPNs in how to treat certain symptoms of prisoners. The Standing Orders

did not include a recommendation for responding to complaints of abdominal pain.  [TT at

127-128].

Normal prisoner medical complaints were processed as "sick calls."  An inmate with

a medical issue would fill out a sick call request and give it to an officer in their dorm. The

officer would put the sick call request in a box and Nurse Grayson would collect them and

see the inmates either that day or the next day.  If an inmate had an emergency medical

situation, they would be given an emergency sick call to fill out and the nurse would be

called and would come immediately.  [TT at 112].

The only evidence of any recourse for a prisoner that was concerned that the LPN

did  not  recognize  that  he  had  a  medical  condition  that  needed  emergency  care  was

through the "inmate request form."   Lt. Fife testified that inmates could send inmate

requests to the chief of security, the position Lt. Fife held during the time of Rodrigue's illness, but that if the chief of security received a medical complaint they could only take the complaint to the warden, who might be able to "take it farther." [TT at 177]. Lt. Fife testified that he received between twenty-five and thirty inmate requests a day. [TT at 175]. There was no procedure in place for inmates to communicate directly with Dr. Smith. [TT at 450] ("Q: Sheriff Tubbs, can you tell me as medical director if there is any procedure in place for Dr. Smith for the inmates to communicate with Dr. Smith? A: Not, not that I'm aware of. I'm sure it would go through the nurse."). The current warden's testimony regarding his authority over medical decisions was unclear, but he did acknowledge that he could respond to an obvious medical emergency that he witnessed, though otherwise the decision to refer a prisoner to receive outside medical attention belonged solely to the LPN. [TT at 185-189].

The Court finds that only the LPN and the Court security officer had the authority to order a prisoner to be removed from the facility for medical reasons. [TT at 190]. No other prison official testified with any degree of certainty that anyone other than the nurse had the authority to refer a patient to outside medical treatment. As a practical matter, the LPN functioned as the sole gateway between an inmate at the prison and outside medical treatment. The only possible method of receiving any relief from a decision of LPN Grayson was through the chief security officer—a position held by Lt. Fife at the time of Rodrigue's illness.

## C.    Analysis

Rodrigue makes two arguments for why Morehouse Parish is liable: 1) the policy of giving a LPN sole discretion to decide when a patient needs outside treatment caused the constitutional violation; and 2) the standing orders that Dr. Smith created for LPN Grayson to follow were inadequate because they did not include a protocol for abdominal pain. [Record Document 104].

The Court finds that Rodrigue has not met his burden of providing by a preponderance of the evidence that Morehouse Parish's policy of vesting discretion in a LPN to determine whether patients with medical complaints need outside treatment caused the constitutional violation.  The Court is troubled by the fact that there was such an informal and limited appeals procedure for prisoners with medical grievances to get a second opinion and the fact that LPN Grayson in particular was for all practical purposes the sole person authorized to refer inmates to outside doctors.  It is conceivable that an effective method of obtaining a second opinion in emergency circumstances could have prevented Rodrigue's injury. The evidence did suggest that the fact that LPN Grayson was the sole gatekeeper to the outside medical community did contribute to Rodrigue's injury. However, the evidence showed the indifference to Rodrigue's complaints exhibited by LPN Grayson and Lt. Fife, rather than the medical policy that gave LPN Grayson discretion to refer Rodrigue to outside clinicians, was the "moving force" behind the constitutional violation.

Rodrigue proved that the general policy of having a LPN act as the sole gateway to outside medical clinicians created a condition that did not mitigate the effects of the constitutional violations.  There was no evidence, however, that the Parish either knew or should have known that an adequately trained and competent nurse would not have been able to act as a gateway between prisoners and outside medical clinicians. There was no evidence that LPN Grayson was either inadequately trained or that there was some constitutional infirmity in the manner of her hiring.  There was no evidence that either the Sheriff or Dr. Smith suspected or should have suspected that LPNs would be unable to fulfill the role of referring prisoners to outside clinicians when necessary.  There was no evidence that the parish should have anticipated that LPNs would ignore prisoner complaints.  In other words, there was no evidence that the deficiencies of the policy itself caused the constitutional violation—only that in this instance the policy did not help to remedy the effects of the constitutional violation.

This suit does not present the situation where a specific policy of a prison clearly caused prison officials to act with deliberate indifference towards inmates.  In Lawson v. Dallas County, for example, the court enumerated the following policies that directly restricted the nurses' ability to care for a paraplegic prisoner:

> initial health and mobility assessments for paraplegics are not routine; dressing changes are allowed only twice per day, and diaper changes and showers must also be completed during this time; nurses are not allowed to enter a prisoner's cell except, if at all, under limited circumstances; nurses are not allowed to help inmates in the shower; foam mattresses are not allowed; mobility supports are not provided; hospital policies that conflict with jail policies are disregarded; and alternative placements for paraplegics are not considered. Had these policies not been in effect,

it is reasonable to expect that Lawson would have received much more personal assistance from the nurses at the jail.

286 F.3d 257, 263-64 (5th Cir. 2002).

While in Lawson, specific policies constrained what prison nurses could do to care for prisoners—therefore directly causing the nurses' deliberate indifference to the prisoner's medical needs—here, LPN Grayson was simply given discretion concerning whether to refer a prisoner to a clinician. Absent additional proof showing that granting this type of discretion to a LPN somehow brings about deliberate indifference on the part of LPNs or that the consequences of the policy are such that those implementing it were made deliberately indifferent to prisoners subjected to it, the Court has insufficient evidence from which to conclude that this policy violates the Eighth Amendment. This is not to say that vesting this type of discretion in a LPN in a prison could never be the moving force behind a violation of the Eighth Amendment, but simply that in this case Rodrigue failed to meet his burden of proving that this policy violated the Eighth Amendment.

Furthermore, the Court is not persuaded that the lack of protocol for abdominal pain in the standing orders prepared by Dr. Smith was the moving cause of the constitutional violation. Even Rodrigue's expert, who thoroughly disapproved of the standing orders, testified that the prison's policy was that if the LPN felt a condition was outside of her level of competence, she should seek the help of someone competent to diagnose the condition:

> So there is absolutely nothing here to suggest how Ms. Grayson is to treat those conditions. So normally I would think – and but it's not stated here – but I would think reasonably thinking that if it's not listed here, then she would have to seek higher level instruction or guidance. So I would think that she would call the next person up, which would be the physician.

[TT at 275]

Thus, the lack of protocol in the standing orders for abdominal pain reduces to the same general policy of vesting discretion in the LPN to refer patients to outside care in the event their level of expertise is exceeded.  On the basis of the evidence presented, then, the Court finds that the constitutional violation was not caused by the lack of enumeration in the standing orders, but by the fact that LPN Grayson ignored Rodrigue's complaints and did not contact an outside clinician to diagnose what she knew to be a potentially serious condition.  Accordingly, the claims against the Parish of Morehouse are dismissed.

## V.     Supervisory Liability

Rodrigue asserts claims of supervisory liability against Sheriff Tubbs, Warden Tapp, and Assistant Warden Brown, alleging that they implemented medical policies that proximately caused Rodrigue's injury.  [Record Document 104, p.14].  A supervisor may be held liable under § 1983 only if he either: 1) affirmatively participates in the acts that cause the constitutional violation; or 2) implements an unconstitutional policy that is the moving force behind the constitutional injury.  Porter v. Epps, 659 F.3d 440, 446 (5th Cir. 2011); Cozzo v. Tangipahoa Parish Council, 279 F.3d 273, 289 (5th Cir. 2002).  The Court has already found that the inadequacy of the medical policy implemented by these three defendants was not the moving force behind the constitutional deprivation.  Rodrigue does not allege that Sheriff Tubbs, Warden Tapp or Assistant Warden Brown affirmatively participated in the acts that caused the constitutional violation.  Accordingly, Sheriff Tubbs, Warden Tapp, and Assistant Warden Brown are not liable on a supervisory liability theory.

## VI.    Damages

The purpose of an award of damages in a § 1983 claim is to compensate the plaintiff for the injuries caused by the deprivation of his constitutional rights. Carey v. Piphus, 435 U.S. 247, 254 (1978).   The rules governing damages developed by the common law of torts provide the appropriate starting point in a § 1983 damages analysis. Id. at 257-58.  Compensatory damages may include out-of-pocket losses as well as mental anguish and suffering. Memphis Community School District v. Stachura, 477 U.S. 299, 307 (1986).   Damages for pain and suffering may also be awarded under § 1983. Jones v. Conner, 233 F.3d 574 (5th Cir. 2000) (unpublished) (citing Thompkins v. Belt, 828 F.2d 298, 301-02 (5th Cir. 1987).

### A.    Causation

Dr. Sasaki testified that in his opinion the delay in diagnosis of Rodrigue's appendicitis caused the complications that kept Rodrigue in the hospital from June 10, 2008 until August 6, 2008.  [TT at 311].  No part of Dr. Inglese's testimony called this opinion into doubt.   Accordingly, the Court finds that the injuries from which Rodrigue suffered from June 10, 2008 until August 6, 2008 were caused by the delay in diagnosis of Rodrigue's appendicitis.   Furthermore, the Court finds that LPN Grayson's decision to ignore Rodrigue's complaints from May 31, 2008 until June 10, 2008 and Lieutenant Fife's decision to ignore Rodrigue's inmate request form dated June 5, 2008 caused Rodrigue's delay in diagnosis.  Dr. Sasaki testified that Rodrigue's appendix perforated around June 6, 2008.  [TT at 308, 364].  If LPN Grayson had not ignored the persistent and extreme

nature of Rodrigue's complaints before June 6, 2008, had referred him to an outside clinician competent to perform a physical examination, and if Lt. Fife had not ignored the inmate request form of June 5, 2008, Rodrigue would not have suffered the serious complications that he did.  Dr. Sasaki testified that because appendicitis is so common, can be so dangerous, and is sometimes difficult to diagnose, surgeons are taught to err on the side of assuming that a condition is appendicitis.   [TT at 244] ("my old professor would say if you – if you don't have ten percent of your cases thinking appendicitis that isn't, then you're not doing enough surgery. You're not doing enough explorations. You're not doing enough detection.").  Given the fact that Rodrigue's symptoms were severe and consistent with the symptoms of appendicitis, the Court is convinced that had he been referred to a competent physician before June 5, 2008, in all likelihood that physician would have explored his abdomen and would have detected his condition before it became critical. Similarly, if Lieutenant Fife had not ignored Rodrigue's inmate request and had allowed Rodrigue access to clinicians competent to diagnose Rodrigue's condition, he would not have suffered the complications that he suffered.  Accordingly, Rodrigue has proved that the complications he suffered from June 10, 2008 until August 6, 2008 were caused by the constitutional violations of LPN Grayson and Lieutenant Fife.

**B.    Medical Costs**

Medical costs fall under the category of "out-of-pocket losses."  Although there was no evidence presented that Rodrigue paid anything for his medical treatment, Rodrigue seeks to recover medical costs.  Rodrigue has submitted only a partial medical bill from the

LSU Shreveport Medical Center.  [Record Document 106].  This bill shows a balance of $.00 for his account.   Defendants have represented to the Court that Rodrigue has no outstanding medical bills and that no entity is seeking or has sought any reimbursement for medical bills paid.  [Record Document 105. pp.13-14].  Similarly, Rodrigue's Counsel claims she could find no legal basis for the State to recover the cost of  Rodrigue's medical care from Rodrigue.  [Record Document 104, p.15].  From the Court's own research, it appears that Louisiana statutory law provides that the "facility receiving state funding for the incarceration" of a prisoner shall pay for the medically necessary care of that prisoner:

> ...in no event shall any person housed in any parish jail facility or state prison in the state of Louisiana, irrespective of his state of residency, be denied medically necessary medical treatment in the nearest general hospital owned or operated by the board. Further, any prisoner treated at a general hospital owned or operated by the board shall have those services paid through the facility receiving state funding for the incarceration of said prisoner.

La. Rev. Stat. Ann. § 46:6 (2012).

The Court takes judicial notice of the fact that the EA Conway Medical Center and the LSU Shreveport Medical Center, the two hospitals where Rodrigue received treatment, are both operated by the Board of Supervisors of the Louisiana State University Agricultural and Mechanical College, and thus fall under La. Rev. Stat. Ann. § 46:6.  Accordingly, it appears that unless some governmental entity is entitled to seek reimbursement for Rodrigue's medical costs from Rodrigue, he will not incur any medical costs.  Rodrigue has not shown that any entity will seek reimbursement for his medical costs.  Therefore he has failed to prove that he is entitled to recover the cost of his medical services.

**C.      Pain and Suffering and Emotional Distress**

Rodrigue also claims he is entitled to damages for "pain and suffering and mental anguish and emotional distress, and fear for his life." [Record Document 104, p.15]. Rodrigue's prayer for "fear for his life" and "mental anguish" damages fall under the category of "emotional distress."   The Court has found that Rodrigue was in excruciating pain from May 31, 2008 until June 10, 2008.  While he was in the hospital for close to two months, Rodrigue suffered the failure of three of his organ systems.  Even with the best of medical care, there is no doubt that Rodrigue suffered pain throughout his extended hospital stay.  Dr. Sasaki testified that his mortality rate was very high during this period. Given the severity of the complications Rodrigue suffered as a result of the constitutional violation, the Court is persuaded that $280,000 would adequately compensate Rodrigue for the physical pain he suffered, the emotional distress he felt when he was not able to get adequate medical attention, and the emotional distress he felt when there was a real risk he would not survive. The assessment of damages for physical and mental pain and suffering is not an exact science. However, in reaching this award, this Court has considered that even with early detection of his condition and prompt treatment, Rodrigue still would have suffered some physical and mental pain. This award does not include any monetary damages for the pain and suffering that Rodrigue would have endured with early detection and prompt treatment. This award compensates Rodrigue only for the pain and suffering which would not have occurred but for the liability of LPN Grayson and Lt. Fife.

**D.      Punitive Damages**

Punitive damages may be awarded in a § 1983 claim if the defendant's conduct was motivated by evil intent or demonstrates reckless or callous disregard for the plaintiff's rights.  Smith v. Wade, 461 U.S. 30, 51 (1983); Williams v. Kaufman City., 352 F.3d 994, 1015 (5th Cir. 2003).  In the context of punitive damages, "recklessness" is understood as "subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations."  Williams, 352 F.3d at 1015 (quotations omitted).  Plaintiff has not persuaded the Court that either Lt. Fife or LPN Grayson met that standard.

**VII.   Conclusion**

For the reasons given above, the Court finds that Defendants LPN Grayson and Lt. Fife violated Calvin Rodrigue's Eighth Amendment right to be free from cruel and unusual punishment and that damages in the amount of $280,000 are adequate to compensate Rodrigue for his pain and suffering and emotional distress caused by the constitutional violations. Furthermore, for the reasons given above, the Court will dismiss the claims against the Parish of Morehouse and Defendants Tubbs, Tapp, Brown and Clacks.

A judgment of the Court will follow the docketing of this opinion.

THUS DONE AND SIGNED this 28th day of September, 2012.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE